UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

LINDA PERRY,

     Plaintiff,

      v.

OXFORD COUNTY MENTAL HEALTH
SERVICES,

     Defendant.

Civil Action No.

**COMPLAINT
AND DEMAND FOR JURY TRIAL
INJUNCTIVE RELIEF SOUGHT**

Plaintiff Linda Perry ("Plaintiff" or "Perry"), by and through counsel hereby complains against Defendant Oxford County Mental Health Services ("Defendant" or "OCMHS") as follows:

**JURISDICTION AND PARTIES**

1.     This action arises under the False Claims Act ("FCA"), 31 U.S.C. § 3730(h), the Maine Human Rights Act ("MHRA"), 5 M.R.S. § 4551 *et seq*., and the Maine Whistleblowers' Protection Act ("MWPA"), 26 M.R.S. § 831 *et seq.*

2.     Defendant is a non-profit Maine corporation with its principal place of business located at 150 Congress St, Rumford, Maine. OCMHS's agent for service of process is Ronald J. McHugh, 150 Congress Street, Rumford, ME 04276.

3.     Plaintiff is a citizen of the United States and State of Maine who resides in the Town of Rumford.

4.     This Court has subject matter jurisdiction over Plaintiff's federal and state claims pursuant to 31 U.S.C. § 3732(a)(FCA) and 28 U.S.C. §§ 1331 and 1367.

5.      On or about June 17, 2013, Plaintiff filed a timely Charge of Discrimination against OCMHS alleging whistleblower retaliation with the Maine Human Rights Commission ("MHRC").

6.      On or about July 31, 2014, the MHRC issued a Notice of Right to Sue with respect to Plaintiff's state law claims.

7.      Plaintiff has exhausted her administrative remedies with respect to all claims set forth in this Complaint.

8.      The majority of the discriminatory practices alleged herein were committed within the State of Maine, primarily in Oxford County.

9.      Defendant is subject to the jurisdiction of this Court.

10.      This action properly lies in the District of Maine pursuant to 28 U.S.C. § 1391(b) because the claims arose in this judicial district.

11.      Defendant has fifty or more employees.

12.      At all material times, Plaintiff was an employee of Defendant within the meaning of the FCA, MHRA, and MWPA.

## JURY TRIAL DEMAND

13.      Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues triable of right by jury.

## STATEMENT OF FACTS

14.      Perry was hired by OCMHS on about June 9, 2010 to work as a Direct Care Staff.

15.      Perry worked for OCMHS from June 2010 until terminated on March 21, 2013.

16.      During the time that Perry was employed by OCMHS Perry was assigned to work at "Andy's Place."

17.      Andy's Place was a residence in the community for OCMHS's clients.

18.     The clients in question who lived at Andy's Place were eligible for MaineCare/Medicaid and received a variety of services for which OCMHS received reimbursement from MaineCare/Medicaid.

19.     Andy's Place was a Private Non-Medical Institution ("PNMI") as defined by the MaineCare regulations, the MaineCare Benefits Manual, and Medicaid regulations.

20.     In its September 13, 2013 letter to the MHRC, counsel for OCMHS stated that Andy's Place was a "community placement where people can choose to live together to receive help with personal care needs."

21.     Counsel for OCMHS's characterization is not completely accurate.  While clients are not involuntarily committed to a PNMI they are required to go through a formal process in order to leave.

22.     On one occasion, Perry witnessed Executive Director Ron McHugh speak with a client who had expressed the desire to leave Andy's Place.  Mr. McHugh discouraged the client from leaving and told the client that he and the staff did not feel it was in the client's best interest to leave.  When the client reiterated his desire to leave Andy's Place, Mr. McHugh told the client that he was not "healthy" enough to live in the community on his own and that the client would need to be evaluated by crisis work and potentially need to return to a hospital setting.  In this context, the client stayed at Andy's Place despite his desire to leave.

23.     During the time that Perry was employed, OCMHS received Medicaid funds through the State's MaineCare program in exchange for providing PNMI services to the residents at Andy's Place as defined in Section 97 of the MaineCare Benefits Manual.

24.     Respondent expressly certified to the State of Maine Department of Health and Human Services ("DHHS") and/or the federal Center for Medicare and Medicaid Services

3

("CMS") that it was providing PNMI services to the residents of Andy's Place that were in compliance with the requirements set out in Section 97 of the MaineCare Benefits Manual and with other State and federal requirements for the provision of the services in question.

25.     By accepting reimbursement from DHHS and/or CMS, OCMHS stated  and/or implied that it was providing services to the residents of Andy's Place that were in compliance with the requirements set out in Section 97 of the MaineCare Benefits Manual and with other state and federal requirements for the provision of the services in question.

26.     During the period from Perry's date of hire through the end of June 2011, Perry received four monthly reviews/supervisory reports.  On these reviews, Perry's supervisor, Erica Johnson, gave Perry all scores of eight or nine on a ten point scale with five meaning "average" and ten reflecting "outstanding".  On these monthly reviews, Ms. Johnson also provided comments complimenting Perry's work performance.

27.     On November 9, 2010, Perry received the one and only discipline provided to her during her employment with OCMHS.  Perry was provided with a written warning for failing to check the calendar for clients' appointments which resulted in a client missing his or her appointment and writing in the wrong date for a rescheduled appointment for the client.

28.     Perry took the warning to heart and did not make any errors of this nature for the remainder of her employment.

29.     On August 29, 2011, Perry received an annual review/supervisory report.  In this review, Perry's supervisor gave her all scores of eight or nine.

30.     In the "Summary of Observations" section of Perry's August 29, 2011 review, Perry's supervisor wrote,

> Linda has easily become a leader for other staff at Andy's Place, she knows her role and adapts very easily to any situation that may present itself.  Linda is

always taking on overtime and helping out when she is available to do so.  Co-workers seem to work well with her and she has a great working relationship with the residents.

31.     In the "Strengths and Limitations" section of Perry's August 29, 2011 review,

Perry's supervisor wrote,

> Linda shows strength in her client interactions as well as her ability to adapt to any situation.  Linda is a team player and helps other staff when necessary.  Linda has no noticeable limitations when it comes to her current position.

32.     On July 24, 2012, Perry received her annual review/supervisory report which was

completed by Perry's supervisor, Erica Glover.  In her review, Ms. Glover gave Perry all scores

of eight, nine, or ten.

33.     In the "Strengths and Limitations" section of the July 24, 2012 review, Ms.

Glover wrote, "Linda's experience and confidence in her dealing with residents is a great

strength of hers.  She is also motivated and competent in her role here at Andy's Place."

34.     In the "Specific steps employee must take to improve performance" section of the

July 24, 2012 review, Ms. Glover wrote, "Linda is a top-notch performer at Andy's Place and

there is nothing that I would suggest at this time to improve her performance."

35.     OCMHS's contemporaneous evaluations of Perry's performance are probative

evidence regarding Perry's performance.

36.     The fact that OCMHS's contemporary evaluations of Perry's performance

contradict the claims made by counsel for OCMHS in his September 13, 2013 letter to the

MHRC evidences pretext.

37.     During the course of Perry's employment, OCMHS failed to provide the residents

of Andy's Place with the PNMI services to which they were entitled.

38.     In addition, during the last few months of Perry's employment, Perry witnessed

and grew concerned that the clients at Andy's Place were not receiving counseling or other services directly from OCMHS's clinicians.  Rather, the only clinician involvement in clients' plans was to participate in staff meetings and provide feedback to non-clinical staff regarding the clients.

39.    Perry repeatedly raised concerns about the lack of direct clinical services during staff meetings but little or nothing was done to address these issues.

40.    In addition, in the months leading up to Perry's termination, Perry brought to OCMHS's attention vis-à-vis its managers that one of the residents was exhibiting symptoms which Perry believed required intervention including direct contact with OCMHS's clinical staff and/or increased visits with outside medical/clinical staff.

41.    OCMHS did not make changes to provide this client with direct contact with OCMHS's clinical staff and/or increased visits with outside medical/clinical staff.

42.    Perry felt that OCMHS's failures with respect to the provision of services to the clients rose to the level of neglect.

43.    Perry also witnessed that OCMHS's clients were not provided with updated Individual Service Plans ("ISP").

44.    In its September 13, 2013 letter to the MHRC, OCMHS conceded that many of the clients' ISPs were out of date.

45.    MaineCare regulations require that PNMI clients have a current and appropriate ISP in place and that the ISP be reviewed and updated at least every ninety days.

46.    Clients at Andy's Place had expired ISPs and would go for periods much longer than ninety days without receiving an updated ISP.

47.    As a result of the outdated ISPs, the goals and objectives contained in the ISPs

were often already met or were obsolete and so staff working with the clients did not have appropriate guidance for how to assist the clients in making progress.

48.     OCMHS's handling of clients' ISPs violated State and federal requirements for the provision of PNMI services.

49.     OCMHS's failure to provide clients with services set out in their ISPs including but not limited to counselling and treatment with clinical staff violated State and federal requirements for the provision of PNMI services.

50.     OCHMHS's failure to provide clients with services which they needed and were entitled to receive including counselling and treatment with clinical staff violated State and federal requirements for the provision of PNMI services.

51.     The neglect of OCMHS's clients set out above violated State and federal requirements for the provision of PNMI services.

52.     OCMHS's failure to meet State and federal requirements regarding ISPs constituted a failure to meet a precondition for payment under MaineCare/Medicaid.

53.     In its September 13, 2013 letter to the MHRC, as set out in more detail below, OCMHS mischaracterized the nature and substance of Perry's reported concerns regarding the program and its ongoing violations of the regulations and deviation from the applicable standard of care.

54.     In addition, OCMHS argued that the sorts of reports by Perry were the regular "sort of give and take" that occurred between OCMHS employees and that therefore it was entitled to terminate Perry in retaliation for her reports.

55.     The plain language of the MWPA clearly protects Perry's reports.

56.     In its September 13, 2013 letter to the MHRC, OCMHS denied and minimized

concerns raised by Perry prior to the March 20, 2013 team meeting and alleged that the things reported by Perry were mere reiterations of information already in OCMHS's possession.

57.     This is not accurate.  Perry raised specific concerns about particular residents and the consequences of inadequate services by OCMHS.

58.      In its September 13, 2013 letter to the MHRC, OCMHS made a number of vague allegations that Perry was "unhappy with Ms. Hamel's leadership" that she "chafed at Ms. Hamel's strong leadership" and that Perry was allegedly resentful regarding Ms. Hamel's promotion.  OCMHS also alleged that its managers spent a substantial amount of time secretly discussing these allegations regarding Perry.  Notably, none of this information regarding Perry's happiness and opinions regarding leadership was expressed to Perry or reflected in supervisions or other documentation of Perry's performance.

59.     In fact, Perry was not "unhappy" with Ms. Hamel and did not resent her for her promotion.

60.     In its September 13, 2013 letter to the MHRC, OCMHS alleged that Perry attempted to "undercut" Ms. Hamel's leadership and work around Ms. Hamel by bringing her concerns regarding the program to Ms. Chaisson.  This is false.

61.     Nothing in the MWPA precludes an employee from bringing good faith concerns to management.

62.     OCMHS's suggestion that Perry bringing concerns regarding deviations from the standard of care to multiple mangers is a performance issue is completely at odds with the MWPA.

63.     Perry did not go to Ms. Chaisson for supervision in order to "undercut" Ms. Hamel.  Rather, in early March 2013, Perry was told that Ms. Chaisson was taking over

8

supervision of staff meetings. Perry was given the impression that Ms. Chaisson would be supervising Ms. Hamel as well.

64.     Perry therefore sent Ms. Chaisson an email asking for supervision. Ms. Chaisson's reply was,

> Did you run this idea by Sue? I don't have an automatic no response, but don't want to undercut her role, either. If it's something that you feel unable to talk to Sue about then I will ask Kirk what the chain of command should be.

65.     Perry responded by saying,

> It isn't something that I feel that I can talk to Sue about. I would talk to Kirk but he is never here. Sorry if I have put you in a tough position. Some of the things that I have to talk about I was going to bring up in staff meeting, and Sue told me that you were going to take over our staff meeting. This is why I was asking you for the supervision. I wasn't trying to undercut anyone.

66.     Ms. Chaisson's response was,

> I totally understand and we can definitely set up a time to talk. You are right about my taking over the clinical supervision of PNMI. Kirk is going to continue as Sue's supervisor, however. Can you access my calendar on outlook? If so, please take a look and let me know if you see a time that would work for you.

67.     After scheduling difficulties, Perry followed up with Ms. Chaisson and explained that Perry had decided to bring her concerns up at the staff meeting. Ms. Chaisson's response to Perry was, "Sounds good."

68.     There was nothing inappropriate about Perry's efforts to share her concerns with Ms. Chaisson.

69.     During a team meeting on March 20, 2013, Perry raised a number of concerns about conditions and practices that Perry believed were violations of the law relating to PNMI services and also were significant deviations from the applicable standard of care for the clients at Andy's Place that rose to the level of neglect.

70.     OCMHS's Team Leader Susan Hamel was the highest level manager involved in

the Team Meeting.

71.     During the meeting Perry reported that she felt that the program at Andy's Place was falling apart, that the clients were being neglected, that at least one client had not seen one of Respondent's clinicians in over a year, and that the clients' ISPs were expired and inadequate.

72.     Ms. Hamel stated during the meeting, "Why has none of this been brought to my attention?"

73.     Perry responded that the issues that she had raised, with the exception of the expired ISPs, had been brought to Ms. Hamel in the past and that Ms. Hamel had not done anything to address them.

74.     Ms. Hamel appeared very angry at this point in the meeting.

75.     During this meeting, another Direct Support Staff named Leslie Hickson expressed that she was upset that OCMHS had taken away vacation time for her position but that managers still received vacation and that she had been scheduled to cover a shift for one of Ms. Hamel's friends so that the friend could attend a birthday party.

76.     In response to Ms. Hickson, Ms. Hamel asked, "Why don't people come and talk to me about things like this?"

77.     Perry told Ms. Hamel that people did not feel comfortable coming and talking to her.

78.     Ms. Hickson told Ms. Hamel that she did not feel comfortable talking to anyone in OCMHS management.

79.     OCMHS has attributed Ms. Hickson's comments to Perry during Perry's termination meeting. OCMHS's claims are contradicted by Perry's testimony and also by Ms. Hamel's own notes.

80.     Specifically, Ms. Hamel met with Ms. Hickson on March 21, 2013 and disciplined her for her outbursts during the meeting. Ms. Hamel's notes of her meeting with Ms. Hickson confirm that Ms. Hickson "yelled" her comments about the schedule during the March 20, 2013 meeting.

81.     During the March 20, 2013 staff meeting, Perry went on to ask Ms. Hamel who they were allowed to bring concerns to since when Perry had sent an email to Assistant Clinical Supervisor Marylena about concerns,  Perry was told that she was not going through the right chain of command for raising concerns.

82.     Ms. Hamel responded by saying that they could bring concerns to Clinical Supervisors Marylena or Kirk or to Ruby Gunther in Human Resources.

83.     Perry responded that Ms. Hamel had told the employees on multiple occasions that she "had Kirk wrapped around [her] little finger" and so Perry did not feel comfortable bringing concerns to Kirk.

84.     Perry also responded that Ms. Gunther was one of Ms. Hamel's best friends.

85.     OCMHS Clinical Supervisor Kirk Little was subsequently called into the meeting and the meeting continued with specific discussion regarding the clients.

86.     The next day, March 21, 2013, OCMHS called Perry and asked that she attend a meeting with Ms. Hamel and Ms. Gunther from Human Resources.

87.     Perry attended the meeting. She was shown a termination notice which indicated that Perry was being terminated for an alleged "violation" that had occurred on March 20, 2013.

88.     The termination notice also indicated that Perry had allegedly refused to receive supervision from managers.

89.     Perry told Ms. Hamel and Ms. Gunther that the termination notice was completely

untrue as Perry had never "refused supervision" and, in fact, had arranged to meet with Perry's supervisor the prior day and Perry's supervisor had not followed through.

90.     Ms. Gunther responded that this did not matter because they were discharging her.

91.     The termination notice also states that a reason for Perry's termination was that Linda's behavior at PNMI team meeting on March 20th was inappropriate and unacceptable.  Linda exhibited aggressiveness and disrespect towards her immediate supervisor during this team meeting.

92.     The termination notice also states that "Linda has displayed unsatisfactory behavior towards her peers by making negative comments to new staff regarding other departments."

93.     These claims are false and evidence of pretext.

94.     Other than discussing the clients and deviations from the standard of appropriate care at Andy's Place later in the meeting, the only communications that Perry had with Ms. Hamel during the March 20, 2013 team meeting were Perry's reports regarding client neglect and expired ISPs and a discussion about where staff could bring their concerns.

95.     Perry did not express concerns in an aggressive or disrespectful manner.

96.     OCMHS's misrepresentation of the facts surrounding its termination of Perry evidences pretext and dissembling by OCMHS in an effort to avoid liability for its violation of the MWPA. MHRA and FCA.

97.     The timing of her termination, the evidence of pretext, and the anger exhibited by Ms. Hamel on March 20, 2013 in response to Perry's reports about the program and the next day at the meeting, all evidence that the real reason for her termination on March 21, 2013 were her protected reports regarding practices and conditions that were illegal, deviations from the applicable standard of patient care and likely violations of the FCA.

98.    Perry's reports regarding the violations of the clients' rights including client neglect and expired ISPs constituted conduct which reasonably could lead to a viable FCA.

99.    Perry's reports regarding the violations of the clients' rights including client neglect and expired ISPs constituted efforts to stop practices that constituted violations of the FCA.

100.    Defendant retaliated against and terminated Perry for reporting what she reasonably believe to be conditions that violated the law and deviated from the applicable standard of patient care.

101.    Defendant retaliated against and terminated Perry because she engaged in conduct which reasonably could lead to a viable FCA and because of her efforts to stop practices that constitutes violations of the FCA.

102.    Perry has no plain, adequate, or complete remedy at law to fully redress the wrongs alleged, and will continue to suffer irreparable injury from their treatment by OCMHS unless OCMHS is enjoined by this court.

## COUNT I: FCA

103.    Plaintiff repeats and re-alleges each of the allegations set forth in paragraphs 1-102 as if fully set forth herein.

104.    Defendant engaged in unlawful discrimination and retaliation within the meaning of the FCA.

## COUNT II: MHRA & MWPA

105.    Plaintiff repeats and re-alleges each of the allegations set forth in paragraphs 1-104 as if fully set forth herein.

106.    Defendant violated Plaintiff's rights under the MWPA as enforced through the

MHRA when it discriminated against and terminated Plaintiff for engaging in protected activity under the MWPA.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully requests that the Court grant the following relief:

(a)     Enter Judgment in her favor;

(b)     Declare the conduct engaged in by Defendant to be in violation of Plaintiff's rights;

(c)     Enjoin Defendant, its agents, successors, employees, and those acting in concert with Defendant from continuing to violate the rights of the Plaintiff;

(d)     Order Defendant to employ Plaintiff in her former position;

(e)     Award Plaintiff equitable relief for back pay, benefits and prejudgment interest;

(f)     Award Plaintiff liquidated damages in an amount to be determined at trial of this matter;

(g)     Award Plaintiff compensatory damages in an amount to be determined at trial of this matter;

(h)     Award Plaintiff punitive damages in an amount to be determined at trial of this matter;

(i)     Award Plaintiff nominal damages;

(j)     Award Plaintiff attorney's fees, including legal expenses, and costs;

(k)     Award Plaintiff prejudgment interest;

(l)     Permanently enjoin Defendant from engaging in any employment practice which discriminates on the basis of an employee's engagement in protected activity under the FCA, MHRA or MWPA;

(n)      Require that Defendant's president and/or chief executive officer mail a letter to all employees of Defendant notifying them of the verdict against them and stating that Defendant will not tolerate retaliation in the future;

(o)      Require that Defendant post a notice in all of their workplaces of the verdict and a copy of the Court's order for injunctive relief;

(p)      Require that Defendant train all management level employees about the illegality retaliation against employees in connection with engaging in activity protected by FCA, MWPA and/or MHRA;

(r)      Grant to Plaintiff such other and further relief as may be just and proper.


Dated:  August 11, 2014

/s/ Chad T. Hansen
Chad T. Hansen, Bar No. 9489

/s/ Peter L. Thompson
Peter L. Thompson, Bar No. 8011

Attorneys for the Plaintiff
Maine Employee Rights Group
92 Exchange Street
Second Floor
Portland, Maine 04101
Tel (207) 874-0905
Fax   (207) 874-0343
chansen@maineemployeerights.com
pthompson@maineemployeerights.com